56 CCPA

**Application of Donald RICHMAN.
Patent Appeal No. 8137.**

United States Court of Customs
and Patent Appeals.
April 17, 1969.

Laurence B. Dodds, Great Neck, N. Y. (Jesse C. Bowyer, Washington, D. C., of counsel), for appellant.

Joseph Schimmel, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for Commissioner of Patents.

Before RICH, Acting Chief Judge, and ALMOND and BALDWIN, Judges.

RICH, Acting Chief Judge.

This appeal is from the decision of the Patent Office Board of Appeals [1] affirming the rejection of claims 23–28 of appellant's application Ser. No. 223,581, filed September 10, 1962, for reissue of his patent No. 2,954,425, granted September 27, 1960, on an application filed July 15, 1953, for "Phase Detector and Color Killer."

There are two issues involved. The first issue is whether appellant is entitled to relief under the reissue statute, 35 U.S.C. § 251,[2] or, more specifically, whether he is estopped, under case law, from obtaining the rejected claims by reason of action he took in the prosecution of his original application to obtain the patent for which reissue is sought. The second issue is whether allowance

---

1. Friedman and Kreek, Examiners-in-Chief, and Burns, Acting Examiner-in-Chief, opinion by Friedman.

2. § 251. *Reissue of defective patents* [First paragraph.]
    Whenever any patent is, *through error without any deceptive intention,* deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee *claiming* more or *less than he* had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue. [Emphasis added.]

of claims 25 and 28 would result in double patenting in view of appellant's patent No. 2,848,537, granted August 19, 1958, on an application filed December 31, 1952, for "Highly Noise-Immune Synchronizing System" (herein called the '537 patent). Both patents issued to the assignee, Hazeltine Research, Inc., which has assented to this application for reissue.

### The Invention

The invention relates to control systems for "compatible" color television receivers, that is, those which will receive either monochrome (black-and-white) or color television transmissions.

A color television broadcast signal comprises a complete brightness or monochrome signal modulated on a high-frequency carrier wave and two color-component signals which are phase and amplitude modulated on a lower frequency subcarrier wave, which wave in turn is also modulated on the main carrier wave. In the receiver, the brightness signal is demodulated and amplified for application to the brightness control element of the color tube either to produce a monochrome picture when no color signals are being broadcast or to control the brightness of the picture when color signals are being broadcast. The two color-component signals are derived from the received signal in a particular phase relationship and then translated into signals representative of the three primary colors, i. e., red, green and blue, which signals may be applied to corresponding cathodes in the color tube, producing the colors in the picture.

To permit such derivation of the necessary color signals, there is periodically interspersed with the picture signals a color-synchronizing signal comprising short bursts of a relatively few cycles of the unmodulated color subcarrier wave. In the receiver, this so-called synchronizing signal is utilized to control a color reference signal generator to maintain it in synchronism with the transmitted signal. The reference generator produces two reference signals in quadrature, or ninety-degree phase relationship, one of which is desirably in quadrature phase with the synchronizing signal. Those two reference signals are combined with the received color-component signals in a color-difference signal detector to produce the necessary signals for application, through a color combining system, to the color picture tube.

Only when the reference generator signals are in synchronism with the received synchronizing signal will the received color signals be processed in the proper phase relationship to reproduce correctly the colors in the picture. To maintain the reference generator in such synchronism, means are provided to automatically return the reference generator to the desired condition whenever minor variations occur. Thus, appellant provides a first phase-detector circuit which compares the phase of the received synchronizing signal with that generator output signal which is desirably in quadrature phase with it. When the desired quadrature phase condition exists, the phase-detector output signal is zero. Variations of the generator output signal from the exact quadrature phase condition which take place during in-synchronism operation result in the phase detector providing an output voltage and that voltage is applied to a reactance circuit connected to the reference generator in a manner to adjust its frequency in such direction as to restore the desired phase condition.

The application discloses two improvements on the conventional apparatus so far described. First, it provides a system for deactivating the color signal channel of the receiver when a monochrome broadcast is being received instead of a color broadcast. Such a circuit, called a "color killer" circuit, prevents unwanted signals, which would otherwise be translated through the color channels, from reaching the picture tube and there producing a deleterious effect on the monochrome picture being produced at that time.

The second improvement is directed to the circumstance that the previously-

mentioned synchronizing circuit for the color reference generator responds only to limited variations from precise synchronism. That characteristic is desirable during in-synchronism operation when a color picture is being produced since it avoids false responses that might be caused by spurious signals which tend to occur, i. e., "noise" signals. However, it prevents the system from automatically reestablishing in-synchronism conditions when larger phase variations occur, as when a new channel is being tuned in. To overcome that difficulty, appellant provides means, operative when the out-of-phase condition of the reference generator exceeds the synchronizing circuit's normal range, to increase both the effective pull-in range and the rate of pull-in. Such operation is known as "two mode synchronization."

To provide the aforementioned features, appellant provides a second phase-detector circuit which responds to the relationship of the synchronizing signal and the second output signal of the generator, that is, the one which is desirably in phase with the synchronizing signal. This second phase detector provides an output voltage which is of a maximum amplitude when the compared signals are in the desired phase relationship but is of a lesser value, such as substantially zero, when the two signals are out of phase by an excessive amount and also when no color-synchronizing signal is received. The maximum signal resulting from satisfactory color-reproducing conditions operates a circuit to maintain in operation an amplifier supplying the color component signals to the color-difference signal detector. If a color-synchronizing signal is not received, the output of the second phase detector falls to substantially zero and the amplifier for the color-difference signals is thereby disabled or rendered inoperative to transmit such signals. The signal output from the second phase detector will likewise drop from its maximum value to substantially zero when a color-synchronizing signal is being received if the reference generator is so far out of synchronism

that the regular synchronizing circuit does not provide an adequate control signal to bring the reference generator back into synchronism. In one form of appellant's invention, the amplifier for the color-component signals provides, when disabled, a signal which increases the gain or amplification of two amplifiers which amplify the respective input signals to the phase-detector circuits. That action increases the amplitude of the output of the first phase detector to increase the range over which the normal synchronizing circuit is effective to restore synchronism. Upon synchronism being restored, the output of the second phase detector returns to its maximum amplitude so that the amplifier is again enabled to translate the color-difference signals. Also, the gains of the amplifiers for the input signals to the phase detectors are reduced to their normal lower values whereby the synchronization control circuit returns to normal operation to adjust for minor phase disturbances in the usual manner.

Appellant points out in his brief that the use of a signal which is "unique" for *both* the condition that no color-synchronizing signal is present (monochrome reception) and the condition that the reference generator is too far out of synchronism to be operative to produce a satisfactory color picture permits his arrangement to operate as a "fail-safe" circuit which "enables the color-signal-translating circuit of the receiver *only* when the set can operate properly to reproduce a color program."

### The Claims

Claims 23 and 25 are representative of the appealed claims and read:

23. A control apparatus for compatible color television receiver wherein it desired automatically to switch off the apparatus for translating color signals when no color signals are being received and to turn on such apparatus when color signals are being received comprising: means for supplying a composite video frequency signal including color signals and a color syn-

chronizing signal; means for translating said color signals; means including a color reference signal generator for generating reference oscillations in synchronism with said synchronizing signal at a desired phase relation thereto; means including a phase detector responsive jointly to said synchronizing signal and to said reference oscillations for producing a control signal indicative of the in-phase component between said synchronizing signal and reference oscillations and having one value when said synchronizing signal and oscillations are in synchronism at said desired phase relation and another value when said synchronizing signal is absent; and means responsive to said control signal for enabling translation of said color signals when said synchronizing signal and oscillations are in such synchronism at said desired phase relation thereto and for disabling said translation when said synchronizing signal is absent.

25. A synchronizing system which is highly stable in the presence of noise signals comprising: means for supplying a synchronizing signal liable to accompanying noise signals; a generator for generating oscillations in synchronism with said synchronizing signal at a desired phase relation thereto but which may be undesirably out of such synchronism; synchronizing means for normally maintaining said oscillations in such synchronism at said desired phase relation with said synchronizing signal including means for confining the response of said synchronizing means to noise signals during in-synchronism operation to a narrow pass band of frequencies, whereby its pull-in performance from out-of-synchronism is unsatisfactory; means including a phase detector responsive

jointly to said synchronizing signal and to said oscillations for producing a control signal indicative of the in-phase component between said synchronizing signal and oscillations and having one value when said signals are in such synchronism at said desired phase relation and another value both when said synchronizing signal is absent and when it is present but is out of such synchronism with said oscillations; and means responsive to said control signal for conditioning said synchronizing means for synchronism and for said response when operating in such synchronism.

Claims 24, 26 and 27, like claim 23, recite a circuit which provides color killing. Claims 24 and 27, like claim 25, define the circuit including the second phase detector as providing a signal that has "another" value *both* when the synchronizing signal is absent and when it is present but out of synchronism with the reference generator oscillations. Claim 28 recites two mode synchronization, as does claim 25, and also describes the output signal from the second detector means in the same manner as claim 25.

### The Reissue Question

■ The examiner rejected claims 23–28 as not supported by a sufficient reissue oath and on grounds that the errors attempted to be corrected "are not of the type contemplated by 35 USC 251, i. e. not errors arising out of inadvertence, accident, or mistake." [3] The board disagreed with the former ground of rejection. As to the latter ground of rejection, the examiner stated in his Answer:

* * * it would appear that instant claims 23–28, as amended, are of the same scope as cancelled claims 1–15 of the original patent. Failure, however, to include in the patented claims the

---

3. The phrase "inadvertence, accident, or mistake" does not appear in 35 U.S.C. § 251 but is derived from the patent statutes in force prior to the 1952 Act, 35 U.S.C. § 64, Sec. 4916 R.S. We pointed out in In re Wesseler, 367 F.2d 838, 54 CCPA 735, that the term "error," as set out in 35 U.S.C. § 251, "is to be interpreted as Congress has stated it, 'error without any deceptive intention,' and in light to Supreme Court decisions favoring the liberal construction of reissue statutes in order to secure to inventors protection for what they have actually invented." See also, In re Willingham, 282 F.2d 353, 48 CCPA 727.

subject matter of deliberately cancelled claims 1–15 would not appear to be a correctable error within the meaning of 35 USC 251.

The examiner continued:

More specifically, in cancelled claims 1–15, for example see claims 7 and 8, appellant recites only broadly that the control signal developed there is a "unidirectional control signal * *". This latter limitation does not specify the polarity of [sic] the magnitude of the control signal as contained in the patented claims, which consequently would have covered systems in which only a change in the level of this control signal is necessary for the performance of the invention and which coverage appellant is now seeking. Appellant was well aware of the coverage afforded by this limitation. As evident from appellant's remarks in original Paper No. 5, page 7, first full paragraph, appellant perceived that other polarity relationships could be employed to derive the benefits of his invention and that claims of the scope of cancelled claims 1–15 would be adequate to cover them. It would appear from this deliberate cancellation of claims 1–15 that appellant made, at best, an error in judgment. An error of judgment in limiting the claims is not correctable by reissue. See In [re] Wadsworth et al., 1940 C.D. 73 [107 F.2d 596, 27 CCPA 735, (1939)].

The second ground of rejection was restated by the board as follows:

The Examiner's second reason for the rejection, as we understand the same as now presented, appears to be based upon an estoppel proposition, to the effect that by describing the control in claims 23 through 28 as involving control signals merely of different values appellant is attempting to recapture subject matter deliberately cancelled by the cancellation of original claims 1 through 15 in the application resulting in the patent.

That rejection was affirmed by the board which stated that it agreed "par-

ticularly" with the reasons given in the second quotation above from the examiner's Answer. The board further commented that the subject matter of claims 25 and 28 "would appear to find analogous correspondence in at least cancelled claim 14."

The solicitor says the question raised by this rejection may be stated as follows:

May appellant, having deliberately included a certain limitation in each of his patent claims and successfully urged the patentability thereof over prior art applied against replaced original claims 1–15 on the basis of a maximum-zero control signal relationship broadly represented by the limitation, now omit that limitation in reissue claims 23–28?

We do not consider this to be an accurate statement. The rejection which the board affirmed is grounded on the proposition that the appealed claims are directed to the *same* subject matter as cancelled claims 1–15 and that appellant is estopped to "recapture" that subject matter by reissue. The question raised is whether the appealed claims are of the same scope as the cancelled claims, not whether they lack some specific recitation absent from the cancelled claims but included in the patent claims.

In support of his position, the solicitor points out that this court, in In re Wesseler (supra, footnote 3), stated that Shepard v. Carrigan, 116 U.S. 593, 6 S.Ct. 493, 29 L.Ed. 723 (1886), "may be support for the rule that one who deliberately adds a limitation to avoid the prior art cannot omit that limitation in reissue claims so as to encroach upon the prior art * * *." Referring back to *Shepard*, however, it is apparent that the situation there was one in which the omission of the added limitation would have resulted in the claim being drawn to the same subject matter as the original rejected claim, to which the limitation was added, thus making it unpatentable *over the prior art* for the same reason as the original claim. We therefore find neither decision to be authority for

the proposition that a limitation added to a claim in obtaining its allowance cannot be broadened, under present statutory law, by reissue if the limitation turns out to be more restrictive than the prior art required. Certainly one might err without deceptive intention in adding a particular limitation where a less specific limitation regarding the same feature, or an added limitation relative to another element, would have been sufficient to render the claims patentable over the prior art.

The solicitor's interpretation of the issue also departs from the examiner's position that the appealed claims "are of the same scope" as the cancelled claims and the board's view that appellant is trying to "recapture subject matter deliberately cancelled." Moreover, the *Wadsworth* case, cited by the examiner in his Answer, in that portion "particularly" approved by the board, turned on a comparison of the scope of the claims sought by reissue with the scope of the cancelled claims rather than on the omission of a particular limitation added in the claims of the original patent.

Turning to the present claims, the examiner, the board, and the solicitor limit their consideration to the terms in which is couched the definition of the control signal which provides the color killing and two mode synchronization.[4] Considering that aspect of the claims, each of appealed claims 24, 25, 27, and 28 requires that the control signal in question have one value when the reference generator output is in synchronism with the synchronizing signal at the desired phase relation and "another value" *both* when the synchronizing signal is absent and when it is present but out of synchronism with the reference generator oscillations. That recitation is significantly more limited than the description of the corresponding signal in cancelled

claims 1–15, typically (in claim 8) as "a unidirectional control signal representative of the phase relation of  *  *  * [the] generated signal and  *  *  * [the] synchronizing signal." The appealed claim recitation sets forth that feature which appellant points out as permitting "fail safe" operation enabling the color signal translating circuit only when the receiver can operate properly to reproduce a color program.

Claims 23 and 26 characterize the signal in question as "having one value when said synchronizing signal and oscillations [of the reference signal generator] are in synchronism at said desired phase relation and another value when said synchronizing signal is absent." The corresponding recitation in cancelled claim 7 is "a unidirectional control signal of maximum magnitude when said first signal [reference generator signal] and said synchronizing signal are in phase" and, in cancelled claims 8 and 14, "a unidirectional control signal representative of the phase relation of said other generated [or developed] signal and said synchronizing signal." Thus, appealed claims 23 and 26 define the control signal in terms of conditions at synchronism on the one hand and absence of a synchronizing signal on the other. In contrast, the cancelled claims compared therewith define the signal in terms of the phase relationship between the generated reference signal and the synchronizing signal without any reference to the absence of the latter signal.

Moreover, another recitation in claims 23 and 26, closely related to the description of the control signal, is plainly more restrictive than corresponding recitations in the cancelled claims. Thus, claims 23 and 26 recite:

 *  *  * means responsive to said control signal for enabling translation of said color signals when said synchro-

---

4. In his brief here, appellant points to a number of differences between certain of his claims and the cancelled claims involving other aspects of the combinations claimed and the solicitor urges that those differences should not be assessed by us because they were not discussed below. We need not rule whether all those differences can properly be considered now because we find the appeal can be determind on the basis of matters which clearly are appropriate for our consideration.

nizing signal and oscillations are in such synchronism at said desired phase relation thereto and for disabling said translation when said synchronizing signal is absent.

Cancelled claim 8, which is more specific than claim 7 in this respect, recites "a circuit for applying said unidirectional signal to said signal-translating channel to control the conductivity thereof" and thus does not specify "enabling" and "disabling" of translation of the color signal when designated conditions prevail. The corresponding recitation in cancelled claim 14, referred to by the board, likewise recites the operation of the circuit responsive to the unidirectional control signal in terms of "controlling the conductivity" of the translating channel rather than the more specific expressions regarding "enabling" and "disabling."

■■ It is thus apparent that each of the appealed claims is more restrictive in at least one significant respect than the cancelled claims and that appellant is not seeking, through the presentation of claims 23–28, to recapture the same subject matter that he sought in cancelled claims 1–15. We find no basis for estoppel. Neither do we find any evidence that appellant intended to settle for less protection than he was entitled to or to omit or abandon the subject matter he seeks here. We do find, as in *Wesseler*, that "while appellant *acted* 'deliberately', he did so in error."[5] The error, so far as the facts of record are concerned, can only be regarded as "error without any deceptive intention" within the terms of 35 U.S.C. § 251. The board's decision affirming the examiner's rejection of claims 23–28 on statutory or estoppel grounds is therefore reversed.

### The Double Patenting Rejection

■ This rejection was stated by the examiner as grounded on claims 25 and 28 "failing to distinguish over the invention claimed by appellant" in his copending '537 patent.

That patent discloses a color television receiver which, like that of the reissue application, incorporates synchronizing means including a first phase-detector circuit for maintaining a color reference signal generator in synchronism with a color synchronizing signal originating in the transmitter. The receiver also comprises an auxiliary control system including a second phase detector responsive to the synchronizing signal and reference generator oscillations at a different phase relationship than the first phase detector to produce different control effects for in-synchronism and out-of-synchronism operation and circuit means responsive to those control effects to modify the operation of the synchronizing means when the reference signal generator is out of synchronism to improve the pull-in performance. The particular circuit which improves such performance is different from the two-mode synchronization circuit of the reissue application and *color killing is not provided.*

The examiner, and the board in affirming, relied on a comparison of '537 patent claim 3 and appealed claim 25. Appellant accepts that comparison as determinative and narrows the issue further to a comparison of a single portion of each claim.

Patent '537 claim 3, with the significant portion emphasized, reads:

3. A highly noise-immune synchronizing system for a television receiver comprising: means for supplying a synchronizing signal liable to accompanying noise signals; a generator for generating oscillations desirably in synchronism with said synchronizing signal but which may be undesirably out-of-synchronism; synchronizing means for normally maintaining said oscillations in-synchronism and at a desired phase relation with said syn-

chronizing signal including means for confining the response of said synchronizing means to noise signals during in-synchronism operation to a narrow pass band of frequencies, whereby its pull-in performance from out-of-synchronism operation is unsatisfactory;

*an auxiliary control system including a phase detector responsive jointly to said oscillations and said synchronizing signal at a phase relation differing from said desired phase relation and substantially unresponsive to noise signals for producing different control effects for out-of-synchronism operation and in-synchronism operation;*

and circuit means for utilizing said control effects for modifying the out-of-synchronism operation of said synchronizing means in such a way that the pull-in performance from out-of-synchronism operation is substantially improved.

The portion of claim 25 (set forth in full above) relied on by appellant as distinguishing from the emphasized part of patent claim 3 is as follows:

\* \* \* means including a phase detector responsive jointly to said synchronizing signal and to said oscillations for producing a control signal indicative of the in-phase component between said synchronizing signal and oscillations and having one value when said signals are in such synchronism at said desired phase relation and another value both when said synchronizing signal is absent and when it is present but is out of such synchronism with said oscillations;

The examiner conceded that there are differences in the disclosures of the '537 patent and the present application. However, he stated that "the only differences" in the critical parts of the claims are that the limitation in the patent claims "calls for the means including the phase detector to produce 'different control effects' for out-of-snychronism operation and in-synchronism whereas claim 25 of the instant case calls for the means including the phase detector to produce a control signal 'having one value' when in in-synchronism operation and 'another value' when they are out-of-synchronism." He held that "Such differences do not patentably distinguish the two inventions, but on the contrary define the same invention in a slightly different way."

In affirming the rejection, the board noted that the phase detectors of both disclosures provide different outputs when the reference generator is off frequency than when it is in synchronism and stated that "Neither claim brings out what the difference in these signals may be, if any." Further stating that both claims require that the "difference in output be used in a control system for pulling the oscillator back into synchronism" and that "Neither claim gives any details as to the system," the board concluded that "the claims do not define specifically different devices."

However, both the examiner and the board overlooked the fact that claim 25 includes the requirement, discussed above in connection with the reissue question, that the phase detector produce a signal that has a second or "another" value *both* when there is no synchronizing signal and when the out-of-synchronism condition exists with a synchronizing signal being received. That characteristic of the control circuit of the present reissue application may be utilized to provide color killing in addition to the two mode synchronization provided in the circuit of the '537 patent. Claim 25 and claim 28, which includes the same limitation, thus define an invention different from the invention defined by claim 3 of the '537 patent.

Neither the examiner nor the board took the position that claims 25 and 28 are unpatentable because the difference between what they define and what is claimed in appellant's '537 patent would have been obvious to those of ordinary skill in the art. Certainly, they have advanced no reason why that might be the case. Accordingly, no question of obviousness arises and our determination that these two appealed claims define

an invention different from that claimed in the '537 patent requires that the double patenting rejection also be reversed.

The decision of the board is reversed.

Reversed.